JOHNSON, Appellant.

v.

MICROSOFT CORPORATION, Appellee.

[Cite as *Johnson v. Microsoft Corp.*, 155 Ohio App.3d 626, 2003-Ohio-7153.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C020564.

Decided Dec. 30, 2003.

---

Stanley M. Chesley, Robert Heuck II, W.B. Markovits and Michael R. Barrett, for appellant.

Gregory A. Harrison and John D. Luken, for appellee.

---

GORMAN, Judge.

{¶ 1} The plaintiff-appellant, Maria Johnson, appeals from the order of the trial court dismissing her amended complaint against the defendant-appellee, Microsoft Corporation, under Civ.R. 12(B)(6). The amended complaint contained three counts: (1) a common-law claim for restitution alleging that Microsoft had charged a monopoly price for its Windows operating system; (2) a claim that Microsoft had violated Ohio's version of the Valentine Act, R.C. 1331.01; and (3) a claim that Microsoft had violated two provisions of the Ohio Consumer Sales Practices Act, R.C. 1345.02 and 1345.03, by engaging in "unfair or deceptive" and "unconscionable acts" relating to a consumer sale. Johnson brought her claims as part of a putative class consisting of all those who had purchased a license to use any version of the Windows operating system within four years of her filing the complaint.

{¶ 2} In her single assignment of error, Johnson argues that she successfully stated claims under Ohio common law, the Valentine Act, and the Ohio Consumer Sales Practices Act. For the reasons that follow, we affirm the judgment of the trial court.

## Background

{¶ 3} Johnson alleged that she had purchased a personal computer ("PC") from a retail merchant, Gateway, and that the PC was loaded with the Windows 98 operating system. She further alleged that the Windows system on her new PC remained inoperable until it was out of the box and in her home, and that she used the PC to indicate her acceptance of an on-screen licensing agreement drafted by Microsoft and entitled "Microsoft End User License Agreement" ("EULA"). When she provided the obligatory acceptance, she alleged, she entered into a separate transaction with Microsoft.

{¶ 4} Johnson further alleged that Microsoft had obtained a monopoly in the market of PC operating systems. She alleged that Microsoft had used its superior position in the market to control price "free of the normal restraints faced in a competitive market." She alleged that the price charged by Microsoft for the Windows operating system was a "monopoly price, far above the price that would be paid in a competitive market."

{¶ 5} Johnson further alleged that Microsoft had erected barriers to competition. Her allegations focused primarily on Microsoft's efforts to thwart competition from Navigator, a browser program introduced by Netscape Communications. She cited the action of the federal government and several states, including Ohio, in *United States v. Microsoft* (C.A.D.C.2001), 253 F.3d 34, which, she alleged, had resulted in findings that Microsoft had violated Ohio's Valentine Act as well as the Sherman Antitrust Act, Section 2, Title 15, U.S.Code. She alleged that these findings had then been upheld in *New York v. Microsoft Corp.* (D.D.C.2002), 209 F.Supp.2d 132.

## The Valentine Act

{¶ 6} Microsoft successfully argued in its motion to dismiss that the United States Supreme Court's decision in *Illinois Brick Co. v. Illinois* (1977), 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707, required a direct purchase from the company in order to confer standing upon Johnson to bring an action against it under Ohio's version of the Valentine Act. Johnson argues, as she did below, that Microsoft's reliance on *Illinois Brick* resulted from a false premise—that Ohio's version of the Valentine Act must be interpreted in lockstep with the federal courts' interpretation of the Sherman Act. According to Johnson, the legislative history of Ohio's Valentine Act establishes the General Assembly's intent to chart a different course—a course followed by the federal courts before *Illinois Brick* [1]

---

1. Before *Illinois Brick*, six of seven federal circuit courts ruling on the issue had held that indirect purchasers could sue for damages caused by a violation of the federal antitrust laws. *Illinois v. Ampress Brick Co.* (C.A.7, 1976), 536 F.2d 1163, reversed sub nom. *Illinois Brick*

—that provides indirect purchasers with standing to sue under antitrust laws. For the following reasons, we agree with the legal analysis propounded by Microsoft.

{¶ 7} Initially, we note that the weight of authority in this state is that the Valentine Act be interpreted consistently with federal antitrust law. The Ohio Supreme Court in *C.K. & J.K., Inc. v. Fairview Shopping Ctr. Corp.* (1980), 63 Ohio St.2d 201, 17 O.O.3d 124, 407 N.E.2d 507, stated that the statutes comprising the Act "were patterned after the Sherman Antitrust Act, and as a consequence this court has interpreted the statutory language in light of federal judicial construction of the Sherman Act * * *." Quoting from *Std. Oil Co. v. United States* (1911), 221 U.S. 1, 62, 31 S.Ct. 502, 55 L.Ed. 619, the court in *C.K.* indicated that violations of the Valentine Act were to be judged on the same basis as violations of the Sherman Act—in other words, on the basis that what was prohibited under the one was prohibited under the other. Id. The parallel construction[2] adopted by the court in *C.K.* was employed by this court in *Acme Wrecking Co., Inc. v. O'Rourke Constr. Co.* (Mar. 1, 1995), 1st Dist. No. C–930856, 1995 WL 84188. In *Acme*, we applied to the Valentine Act the antitrust-injury requirement of the Clayton Act, Section 4, Title 15, U.S.Code, which permits a private civil cause of action to be brought by persons injured by conduct forbidden by the Sherman Act and other antitrust laws.[3]

{¶ 8} Prior to the United States Supreme Court's decision in *Illinois Brick*, and at the time that Ohio's version of the Valentine Act was enacted, there was no direct-purchaser requirement for standing to bring a claim under the Valentine Act.[4] However, in 1977, the United States Supreme Court decided *Illinois*

---

*Co. v. Illinois* (1977), 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707; *Yoder Bros., Inc. v. Cal.-Fla. Plant Corp.* (C.A.5, 1976), 537 F.2d 1347; *In re W. Liquid Asphalt Cases* (C.A.9, 1973), 487 F.2d 191; *Illinois v. Bristol–Myers Co.* (C.A.D.C.1972), 470 F.2d 1276; *West Virginia v. Chas. Pfizer & Co.* (C.A.2, 1971), 440 F.2d 1079; *Mangano v. Am. Radiator & Std. Sanitary Corp.* (C.A.3, 1971), 438 F.2d 1187 (upholding dismissal of indirect-purchaser claim); and *South Carolina Council of Milk Producers, Inc. v. Newton* (C.A.4, 1966), 360 F.2d 414.

**2.** It should be pointed out that our use of the term "parallel construction" is not meant to imply a lockstep approach, but one in which federal guidance is generally followed for the sake of uniformity.

**3.** The antitrust-injury requirement, like the direct-purchaser standing requirement, was the product of judicial construction. See *Atlantic Richfield Co. v. USA Petroleum Co.* (1990), 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333. The requirement of an antitrust injury imposed upon the plaintiff the burden to show not merely any type of injury causally linked to an illegal presence in the market, but, rather, an injury of the type that the antitrust laws intended to prevent—i.e., an injury directly resulting from the anticompetitive aspect of the defendant's behavior. Id. at 344, 110 S.Ct. 1884, 109 L.Ed.2d 333.

**4.** See fn. 1.

*Brick* and imposed such a requirement. The court's holding was a corollary of its earlier holding in *Hanover Shoe v. United Shoe Mach. Corp.* (1968), 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231. In *Hanover Shoe,* the court had held that middlemen could recover the full amount of a manufacturer's illegal overcharge without any deduction for the amount of the illegal overcharge "passed-on" to the middlemen's consumers. The court in *Illinois Brick* imposed the direct-purchaser standing requirement to avoid the possibility of duplicate recoveries by both middlemen and consumers created by *Hanover Shoe.* Id. at 725–748, 97 S.Ct. 2061, 52 L.Ed.2d 707. The court reasoned that treble-damage proceedings in actions brought by middlemen against the monopolist would be greatly complicated and rendered less effective if they were forced to include an analysis of how much of the illegal overcharge of the monopolist was absorbed by the middlemen and how much was then passed on to the consumer. Id. at 745–747, 97 S.Ct. 2061, 52 L.Ed.2d 707. The court wished to avoid the difficulties and uncertainties of measuring, tracing, and apportioning damages between the two groups (middlemen and consumers) based upon pass-on theories. Further, the court expressed its concern that the dispersion of damages among a much larger group of plaintiffs that included individual consumers would lessen the incentive to sue for such a diluted individual recovery. Id. at 745–746, 97 S.Ct. 2061, 52 L.Ed.2d 707.[5]

{¶ 9} After *Illinois Brick,* the court in *California v. ARC Am. Corp.* (1989), 490 U.S. 93, 109 S.Ct. 1661, 104 L.Ed.2d 86, held that states were not obligated to impose their own direct-purchaser standing requirement upon state antitrust laws. The court reiterated that *Illinois Brick* was intended to interpret only federal antitrust laws, and that state antitrust statutes conferring standing upon indirect purchasers were not preempted by federal law. Id. at 101, 105–106, 109 S.Ct. 1661, 104 L.Ed.2d 86. Nonetheless, a majority of state courts that have considered the issue in the absence of legislative intervention have followed a course of parallel federal-state construction and incorporated *Illinois Brick*'s direct-purchaser requirement into their states' versions of the Valentine Act. See *Pomerantz v. Microsoft Corp.* (Colo.App.2002), 50 P.3d 929; *Vacco v. Microsoft Corp.* (2002), 260 Conn. 59, 793 A.2d 1048; *Hindman v. Microsoft Corp.* (July 20, 2000), Hawaii Dist. Ct. No. 00–1–0945; *Berghausen v. Microsoft Corp.* (2002), 765 N.E.2d 592; *Arnold v. Microsoft* (2001), Ky.App. No. 2000–CA–002144–MR, 2001 WL 1835377; *Davidson v. Microsoft Corp.* (2002), 143 Md.App. 43, 792 A.2d 336; *O'Connell v. Microsoft Corp.* (June 14, 2001), Mass. Sup.Ct. No. CA 0001743, 2001 WL 893525; *Ireland v. Microsoft Corp.* (Jan. 24, 2001), Mo. Cir. Ct. No. OOCV–201515, 2001 WL 1868946; *Arthur v. Microsoft Corp.* (June 25, 2003), Neb. No.

---

5. Some courts have concluded that the holding in *Illinois Brick* did not preclude injunctive relief for the indirect purchaser. See, e.g., *Mid–West Paper Prod. Co. v. Continental Group* (C.A.3, 1979), 596 F.2d 573, 583–587.

S–01–1325; *Krotz v. Microsoft Corp.* (June 19, 2000), Nev. Dist. Ct. No. A41631; *Minuteman, LLC v. Microsoft Corp.* (2002), 147 N.H. 634, 795 A.2d 833; *Major v. Microsoft Corp.* (Okla.App.2002), 60 P.3d 511; *Daraee v. Microsoft Corp.* (June 27, 2000), Ore. Cir. Ct. No. 0004–03311, 2000 WL 33187306; *Siena v. Microsoft Corp.* (R.I.2002), 796 A.2d 461; and *Weinberg v. Microsoft Corp.* (Aug. 18, 2002), Tex. Dist. Ct. No. D–162, 526.[6]

{¶ 10} Of equal significance, although some 26 states and the District of Columbia do allow for some form of indirect-purchaser actions, 23 of these jurisdictions do so only because of *Illinois Brick* repealer statutes passed by their respective legislatures. Many of these repealer statutes, in turn, limit indirect-purchase actions to the state attorney general as parens patriae.[7]

{¶ 11} Ohio is not among the states that have passed an *Illinois Brick* repealer statute. Still, Johnson argues that, despite the weight of authority to the contrary, *Illinois Brick's* direct-purchaser requirement should not be applied to Ohio's Valentine Act. The reason, Johnson argues, is that the Ohio legislature never manifested an intent that the Act would be subject to evolving federal antitrust law. To support this argument, Johnson isolates the following language in *List v. Burley Tobacco Growers' Co-op. Assn.* (1926), 114 Ohio St. 361, 370, 151 N.E. 471: "[W]hen the Valentine Law was enacted in Ohio the Ohio Legislature adopted the judicial construction already placed upon the federal act by the federal courts * * *." According to Johnson, this language should be read to mean that the *only* federal judicial construction the legislature intended to adopt was that in effect at the time it passed Ohio's version of the Valentine Act on April 19, 1898. To accept the contrary view, Johnson argues, in other words that

---

**6.** For courts reaching the opposite result, see *Bunker's Glass Co. v. Pilkington* (2003), 206 Ariz. 9, 75 P.3d 99; *Comes v. Microsoft Corp.* (Iowa 2002), 646 N.W.2d 440; *Hyde v. Abbott Labs., Inc.* (1996), 123 N.C.App. 572, 473 S.E.2d 680; and *Sherwood v. Microsoft Corp.* (July 31, 2003), Tenn.App. No. M2000–01850–COA–R9–CV.

**7.** Alabama, Ala.Code 6–5–4(d); California, Cal.Bus. and Prof.Code 16750(a); Colorado, Colo. Rev.Stat. 6–4–111(2) (authorizing the state attorney general to bring suit for indirect injury to any government or public entity); District of Columbia, D.C.Code Ann. 28–4509; Hawaii, Hawaii Rev.Stat. 480–3, 480–13, and 480–14 (allowing the state attorney general to file class-action suit on behalf of indirect purchasers); Idaho, Idaho Code 48–108(2) (permitting the state attorney general as parens patriae to bring suit); Illinois, 740 Ill. Comp. Stat. 10/7(2); Kansas, Kan.Stat.Ann. 50–161(b): Maine, Me.Rev.Stat.Ann., Title 10, Section 1104(1); Maryland, Md.Code Ann., Com. Law II, Section 11–209(b)(2)(ii) (allowing the state and its subdivisions to bring indirect-purchaser suits); Michigan, Mich.Comp.Laws 445.778(2); Minnesota, Minn.Stat. 325D.57; Mississippi, Miss.Code Ann. 75–21–9; Nebraska, Neb.Rev. Stat. 59–821; Nevada, Nev. Rev.Stat. 598A.210(2); New Mexico, N.M.Stat.Ann. 57–1–3(A); New York, N.Y. Gen.Bus.Law 340(6); North Dakota, N.D.Cent.Code 51–08.1–08(3); Oregon, Ore.Rev.Stat. 646.775 (allowing attorney general to sue on behalf of indirect purchasers); Rhode Island, R.I. Gen. Laws 6–36–12 (same); South Dakota, S.D.Codified Laws 37–1–33; Vermont, Vt.Stat.Ann. Title. 9, Section 2465(b); Wisconsin, Wis.Stat. 133.18(1)(a).

of an ongoing parallel construction, would give the federal courts the power to amend Ohio statutes. In short, Johnson advocates the view that "[i]f a 'direct-purchase' requirement is to be found in the Valentine Act, it must either appear in the language of the statute, or, under *List,* in the federal construction of the federal statute when the General Assembly enacted or amended the Valentine Act."

{¶ 12} We disagree with Johnson in several respects. First, it is an exaggeration to suggest that a policy of parallel construction somehow grants the federal courts the power to make Ohio law. Obviously, the Ohio legislature can at any time pass legislation that effectively repeals *Illinois Brick*'s direct-purchaser requirement, as 23 states have already done, and the Ohio Supreme Court can decide at any time that the requirement is not what the legislature intended in the first place. We are convinced, however, that the court in *C.K.* established the principle that Ohio's Valentine Act should be interpreted by Ohio lower courts in a manner consistent with federal interpretation of the Sherman Act. Furthermore, we are not persuaded to the contrary by the language in *List* quoted by Johnson. *List* was decided in 1926, *C.K.* in 1980. In *C.K.,* the court relied upon the *Standard Oil Co. of New Jersey v. United States* (1911), 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 case that was decided by the United States Supreme Court in 1911, thus refuting the notion that the court's language in *List* limited the applicability of federal judicial construction to that existing at the time the Valentine Act was passed in 1896. Furthermore, as noted previously, this court in *Acme Wrecking* applied to the Valentine Act the antitrust-injury limitation that was articulated by the United States Supreme Court in *Atlantic Richfield Co. v. USA Petroleum Co.* (1990), 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333—a federal case that followed passage of the Valentine Act by almost a century.

{¶ 13} Guided by the principle of stare decisis, we believe that this court has already adopted and applied an ongoing parallel federal-state construction of the Valentine Act. The rules of the game were established, we believe, in *C.K.* To hold otherwise now would not be consistent with our own precedent in *Acme Wrecking.* Furthermore, eschewing the direct-purchaser requirement would place this court outside what is clearly the weight of authority among state courts that have considered the same issue.[8] In our view, as evidenced by the legislative action taken by 23 of the 27 jurisdictions that have elected to allow indirect-purchaser actions, the decision is one involving public policy and thus should be made by the legislative rather than the judicial branch.

---

8. We also note that the Uniform State Antitrust Act encourages the same type of federal-state uniformity. See Uniform State Antitrust Act Prefatory Note, 7C U.L.A. at 352.

{¶ 14} Finally, we note that we find nothing in the language of the Ohio statute that would dictate a different result. Ohio's version of the Valentine Act provides that "the person injured in the person's business or property by another person by reason of anything forbidden or declared to be unlawful [under the Act], may sue therefor * * *." R.C. 1331.08. Although at first blush this language may seem broad enough to infer an intent by the legislature to part company with *Illinois Brick* and allow for suits by indirect purchasers, it is essentially the same language that appears in the Clayton Act, and has therefore been rejected as a basis for diverging from the direct-purchaser requirement in jurisdictions such as Ohio that follow the federal paradigm. See *Major*, supra, 60 P.3d at 513.[9]

{¶ 15} Johnson argues, alternatively, that even if the direct-purchaser requirement is held to be applicable under Ohio law, the licensing agreement that she entered into with Microsoft was sufficiently direct to satisfy the requirement. Johnson argues that the agreement was directly between Microsoft, the licensor, and herself, as licensee, and had nothing to do with the retailer, Gateway, as middleman. She advocates that we view the license agreement as, in essence, Microsoft's product that she "purchased" by using her computer to manifest her agreement to the terms of the license.

{¶ 16} As Microsoft correctly argues, the United States Supreme Court has rejected an industry-specific approach to *Illinois Brick*, in other words, different rules for different industries. *Kansas v. UtiliCorp United Inc.* (1990), 497 U.S. 199, 110 S.Ct. 2807, 111 L.Ed.2d 169. According to Microsoft, the position advocated by Johnson would constitute a "software exception" unique to the computer industry and violate *UtiliCorp*'s rejection of exceptions for a particular market. We find this logic persuasive, as we do the decisions of other courts that have refused to equate a direct licensee in an indirect purchase with a direct purchaser. See, e.g., *Pomerantz*, supra, 50 P.3d at 934–935; *Davidson v. Microsoft Corp.*, supra, 143 Md.App. at 53, 792 A.2d 336; *Minuteman, LLC*, supra, 147 N.H. at 640–641, 795 A.2d 833; *Major*, supra, 60 P.3d at 515; *Siena*, supra, 796 A.2d at 465; *Sherwood v. Microsoft Corp.* (July 31, 2003), No. M2000–01850–COA–R9–CV, 2003 WL 21780975 at * 5, 2003 Tenn.App. LEXIS 539 at 16 (use of the end-user license agreement as an exception to the indirect-purchaser preclusion "uniformly rejected"); and *In re Microsoft Corp. Antitrust Litigation* (D.Md.2001), 127 F.Supp.2d 702, 709. As these courts have, correctly in our view, reasoned, "[w]hether the consumer purchases the software or [the EULA] the immediate economic transaction constituting the purchase occurs between the

---

**9.** As we note infra in fn. 10, the holding of *Illinois Brick* is at its core a definition of who can be said to have suffered injury under federal antitrust law, and, therefore, by applying *Illinois Brick* to R.C. 1331.08, it must be said that an indirect purchaser is not "the person injured."

consumer and the OEM or the retailer seller." *Pomerantz,* supra, 50 P.3d at 934–935. Because the OEM or retail seller deals with the indirect purchaser, it strikes us that the court's stated aversion to the complicating nature of pass-on theories in *Illinois Brick* remains equally pertinent here.

{¶ 17} Because we hold that the direct-purchaser requirement deprived Johnson of standing [10] to pursue a claim under the Valentine Act, we need not reach the other issues raised by the parties concerning the allegation of sufficient intrastate activity and the necessity of alleging "a combination, contract, or agreement." Even if we were to agree with Johnson on both these issues, the fact remains that she lacked standing to assert a damage claim under the Act [11] because she did not purchase her PC with its preloaded software from Microsoft.

*Restitution*

{¶ 18} Johnson argues that even if she lacked standing under the Valentine Act, her restitution claim, on behalf of the putative class, still stated a viable claim for relief. In this regard, she argues that she alleged all the necessary elements to support claims of equitable restitution and unjust enrichment—to wit, that she and members of the putative class had conferred a benefit upon Microsoft and that it would be unjust or unfair to allow Microsoft to retain the benefit given its alleged monopolistic and anticompetitive activities.

{¶ 19} A restitution claim is designed to force the defendant to disgorge benefits that it has wrongfully or unjustly obtained. Dobbs, Remedies (1973), Section 4.1, at 224. Microsoft responds correctly, in our view, that the only direct benefit Johnson or members of the putative class conferred was the money that they paid to the retailers who sold them their individual computers or software. A promissory click to the Microsoft licensing agreement, following a purchase of the computer, was an indirect or incidental benefit to Microsoft, and as such it was insufficient under Ohio law to support a claim of restitution. Cf. *Norton v.*

---

**10.** Although we have couched the issue as one of standing, it should be noted that there is some debate in the cases whether *Illinois Brick* is concerned with standing or the definition of injury. As the court in *Illinois Brick* noted, the questions of who has standing and which persons have sustained injury are "analytically distinct," and its precise holding was that the direct purchaser, not the indirect purchaser, was the one injured for the purposes of federal antitrust law. *Illinois Brick,* supra, 431 U.S. at 728, 97 S.Ct. 2061, 52 L.Ed.2d 707, fn. 7. While we acknowledge this analytic distinction, the two concepts merge for practical purposes, and we use the word *standing*, admittedly loosely, to denote a person who has sustained an injury sufficient to give rise to an actionable claim.

**11.** See fn. 2, supra. As the court noted in *Mid–West Paper Products,* it is arguable that injunctive relief may still be available to an indirect purchaser even after *Illinois Brick* since such equitable nonmonetary relief would not be complicated by pass-on theories as would a claim for treble damages.

*Galion* (1989), 60 Ohio App.3d 109, 110, 573 N.E.2d 1208. Johnson, it should be noted, wanted more than simply to take back her promise to abide by the terms of the licensing agreement. Rather, in her view, by clicking her agreement on the computer, she was "purchasing" the licensing agreement, and her complaint asked for restitutionary damages equal to an amount that she and other members of the class claimed they had been overcharged for the software. We agree with Microsoft that this was essentially the putative class's antitrust claim in a different guise, and that the same difficulties of pass-on theories and the like that troubled the court in *Illinois Brick* would confound calculation of any proper apportionment of damages between consumers such as Johnson and the retailers from whom they bought their computers.

### Ohio Consumer Sales Practices Act

{¶ 20} Johnson argues, finally, with respect to her remaining claim on behalf of the class under the Ohio Consumer Sales Practice Act, that the trial court applied an overly strict pleading requirement. She argues that the court required her to plead with a higher degree of specificity than that called for under the general rule that such claims be pleaded with only "reasonable specificity." See *Amato v. Gen. Motors Corp.* (1982), 11 Ohio App.3d 124, 130, 11 OBR 203, 463 N.E.2d 625. We disagree.

{¶ 21} As Microsoft points out, the Ohio Consumer Sales Practices Act has specific rules permitting a class action. Under R.C. 1345.09(B), a class action is permitted under the Act if the plaintiff alleges that the substantive provisions of the Act have been violated, and (1) a specific rule or regulation has been promulgated under R.C. 1345.05 that specifically characterizes the challenged practice as unfair or deceptive, or (2) an Ohio state court has found the specific practice either unconscionable or deceptive in a decision open to public inspection. As Microsoft points out, Johnson pleaded neither of these elements despite the fact that she brought her claim as part of a class action.

{¶ 22} Furthermore, we find persuasive Microsoft's argument that it is questionable whether the Ohio Consumer Sales Practices Act can even be said to apply to monopolistic and anticompetitive behavior, which is more correctly described as a manipulation of market forces than as a sales practice. The Consumer Sales Practices Act is targeted toward "suppliers" who are *"engaged in the business of effecting or soliciting consumer transactions * * *."* (Emphasis supplied.) R.C. 1345.01(C). Under R.C. 1345.02, unfair or deceptive sales practices are those that are likely to induce in the consumer a false state of mind concerning the product itself. R.C. 1345.03 sets forth certain circumstances to be used in determining whether a sales act or practice is unconscionable, and these indicate that unconscionability is directed toward some inherent unfairness in the

act of sale, such as overcharging, price gouging, unreasonable refusal to refund, and selling to those unable to pay. None of these stated practices provides support for a claim based upon alleged antitrust violations that affect competitive forces in the marketplace, which we believe that the legislature intended to exclusively address under the Valentine Act.

{¶ 23} A similar issue arose in *Sherwood,* supra, a case in which the Tennessee appeals court held that the state antitrust statute *did* provide for indirect-purchaser actions based upon certain unique language in the Tennessee statute. The *Sherwood* plaintiffs had also sought recovery under the Tennessee Consumer Protection Act, Tenn.Code Ann. 47–18–101–1808, upon the basis that the same arrangement in restraint of trade also constituted a violation of the TCPA. The *Sherwood* court rejected, however, the proposition that the same anticompetitive conduct actionable under the antitrust statute was actionable under the consumer protection statute, despite the statutory admonition that the TCPA was to be liberally construed to "protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce * * *." Tenn.Code Ann. 47–18–102(2). Tracing the history of the Tennessee statute back to the development of the Uniform Trade Practices Act and Consumer Protection Law developed in the 1960s, the court noted that, as these and other uniform acts [12] evolved, state legislatures were faced with the choice of adopting either a version that mirrored the Federal Trade Commission Act, Section 45(a)(1), Title 15, U.S.Code, prohibiting both unfair methods of competition and unfair or deceptive acts or practices (referred to as the "little FTC Act" version), or another version that elected only to prohibit unfair and deceptive acts and practices without including language targeting unfair methods of competition. *Sherwood,* supra, at * 32, 2003 Tenn. App. LEXIS 539 at 108. The Tennessee court reasoned that because the history of consumer-protection legislation clearly showed that at the time the Tennessee legislature adopted its version of the Consumer Protection Act, its legislators had the benefit of the uniform laws and the federal law, the only conclusion to be drawn was that the Tennessee General Assembly "knowingly chose not to include antitrust or anticompetitive conduct as actionable under the TCPA." Id. at * 33, 2003 Tenn.App. LEXIS 539 at 110.

{¶ 24} We find the same logic persuasive here. Indeed, it would have been a small matter for the General Assembly to include language in the Ohio Consumer Sales Practices Act prohibiting unfair methods of competition if it had wished to do so. By comparing and contrasting the two statutes, we find it to be quite

---

12. Other uniform acts included the Uniform Deceptive Trade Practices Act, 7 U.L.A. 35 (1978), and the Uniform Consumer Sales Practices Act, 7A U.L.A. 1 (1978).

clear that the Valentine Act was meant to be the legal remedy in Ohio for the type of conduct for which Johnson has sought recourse. Unfortunately for her and the putative members of her class, the direct-purchaser requirement of *Illinois Brick* forecloses the type of action she wishes to bring until the legislature or the Ohio Supreme Court repeals or rejects it.[13]

{¶ 25} In sum, we hold that Johnson's amended complaint failed to state claims under Ohio common law, the Valentine Act, or the Ohio Consumer Sales Practice Act. Accordingly, the trial court did not err when it granted Microsoft's motion to dismiss for failure to state a claim under Civ.R. 12(B)(6). The judgment of the trial court is affirmed.

Judgment affirmed.

DOAN, P.J., concurs.

PAINTER, J., dissents.

PAINTER, Judge, dissenting.

{¶ 26} As the majority correctly points out, there was no direct-purchaser requirement for standing to bring a Valentine Act claim prior to *Illinois Brick*.

{¶ 27} The weight of the authority does indeed provide that the Ohio Valentine Act is to be interpreted consistently with federal antitrust law. But that does not mean that we must follow the federal courts blindly when interpreting Ohio law. *Illinois Brick* interpreted the *federal* antitrust laws as precluding any claims by indirect purchasers. And the federal antitrust laws were intended to supplement, not displace, state antitrust remedies.[14]

{¶ 28} After *Illinois Brick*, which drastically changed federal antitrust law, many states reenacted their own laws to specifically reject the *Illinois Brick* doctrine. Ohio did not—but reading much of anything into legislative inaction is dangerous. When our Valentine Act was passed, indirect purchasers had stand-

---

13. We are not persuaded to the contrary by Johnson's observation that in *Shaver v. Std. Oil Co.* (1993), 89 Ohio App.3d 52, 623 N.E.2d 602, "both antitrust claims and CSPA claims peacefully coexisted." *Shaver* involved a tying agreement whereby the plaintiff gasoline-station owner was required to sell one product tied to another to his customers as part of what he alleged was an effort by the oil company to convert his leased station to a company-owned station. The case may stand for the proposition that a company may commit both antitrust violations and unfair or unconscionable sales practices at the same time, but it does not stand for the proposition that all anticompetitive behavior is a sales practice under the CSPA.

14. *California v. ARC Am. Corp.* (1989), 490 U.S. 93, 109 S.Ct. 1661, 104 L.Ed.2d 86.

ing to sue. Why a federal interpretation of a federal law should change Ohio law escapes me.

{¶ 29} Twenty-seven other jurisdictions do allow for some indirect-purchaser actions. And Arizona, Iowa, North Carolina, and Tennessee courts have all upheld indirect-purchaser actions despite their legislatures' failure to enact repealer statutes.[15] Ohio should follow their lead.

{¶ 30} The Valentine Act was adopted long before *Illinois Brick*. It allowed for indirect-purchaser actions. Now, the majority notes that Ohio can pass legislation to repeal the direct-purchaser requirement. But Ohio should not have to enact a new statute every time a federal court rules on a new antitrust case. What was the law prior to *Illinois Brick* should continue to be the law. Ohio should allow indirect-purchaser actions under the Valentine Act.

{¶ 31} The language of the Valentine Act is broad in granting standing to anyone "injured in the person's business or property by another person by reason of anything forbidden or declared to be unlawful * * *."[16] The Valentine Act prohibits a trust from fixing prices "to the public or consumer" in any manner.[17] Trusts also cannot contract to fix prices to preclude unrestricted competition "among themselves, purchasers, or consumers * * *."[18] And no person shall enter into a combination, contract, or agreement with the intent to fix the price or lessen the production or sale "of an article or service of commerce, use, or consumption * * *."[19] This language shows a clear intent to allow consumers to proceed under Valentine. And consumers are usually indirect purchasers.

{¶ 32} The four jurisdictions without repealer statutes that have found indirect-purchaser claims to be valid have based their decisions on similar statutory language.[20] The similarity to the Clayton Act did not give them pause other than

---

**15.** *Bunker's Glass Co. v. Pilkington* (2003), 206 Ariz. 9, 75 P.3d 99; *Comes v. Microsoft Corp.* (Iowa 2002), 646 N.W.2d 440; *Hyde v. Abbott Labs., Inc.* (1996), 123 N.C.App. 572, 473 S.E.2d 680; and *Sherwood v. Microsoft Corp.* (July 31, 2003), Tenn.App. No. M2000–01850–COA–R9–CV.

**16.** R.C. 1331.08.

**17.** R.C. 1331.01(B)(4).

**18.** R.C. 1331.01(B)(5).

**19.** R.C. 1331.02.

**20.** See *Bunker's Glass Co. v. Pilkington* (2003), 206 Ariz. 9, 75 P.3d 99; *Comes v. Microsoft Corp.* (Iowa 2002), 646 N.W.2d 440; *Hyde v. Abbott Labs., Inc.* (1996), 123 N.C.App. 572, 473 S.E.2d 680; and *Sherwood v. Microsoft Corp.* (July 31, 2003), Tenn.App. No. M2000–01850–COA–R9–CV.

to assert their judicial rights to interpret their own state statutes. We, too, should not stumble on similarities in the language.

{¶ 33} *Illinois Brick* dramatically changed the landscape of federal antitrust litigation. It effectively eliminated a remedy for the one party who was most likely to be injured by antitrust violations—the consumer.[21] To suggest that Ohio should continue to apply an ongoing parallel federal-state construction here undermines Ohio courts' authority and robs consumers of their day in court.

{¶ 34} I am also not convinced of *Illinois Brick*'s rejection of the industry-specific approach, which the majority now adopts. The EULAs are contracts between Microsoft and the end user—no more, no less. There may not be a direct exchange of money, but the license *is* the product. Allowing Microsoft to escape antitrust liability simply because it has figured out a way to insert a buffer of retailers, OEMs, and EULAs between it and its consumers creates an industry-specific exception to justice.

{¶ 35} Microsoft is in direct privity with its end users. Perhaps if Microsoft were willing to forgo any and all suits arising out of these EULAs, then the end users would simply be indirect purchasers. But Microsoft uses the OEMs or retailers to get PCs into the users' homes and businesses. It then uses that direct contact with all consumers to force an EULA on all end users before they can use the computers that they purchased from somebody other than Microsoft. And Microsoft accomplishes all of this without suffering any of the ordinary legal consequences. Standard Oil never had it so easy.

{¶ 36} Therefore, I respectfully dissent.